FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

AUG 2 8 2009

Stephan Harris, Clerk
Casper

# United States District Court
## For The District of Wyoming

SIERRA CLUB,  )
  )
    Plaintiff,  )
  )
vs.  )    Case No. 09-CV-22-D
  )
TWO ELK GENERATION PARTNERS,  )
LIMITED PARTNERSHIP,  )
  )
    Defendant.  )

## ORDER GRANTING MOTION TO DISMISS

This matter comes before the Court on motion to dismiss by Defendant Two Elk Generation Partners ("Two Elk"). Having considered Defendant's motion and Plaintiff Sierra Club's response thereto, as well as having conducted a hearing on the matter, and considering itself in all respects fully advised and informed, the Court hereby FINDS and ORDERS:

### I. Background

Now before the Court is a Motion to Dismiss filed in an action brought by the Sierra Club under the citizen suit provision of the Clean Air Act ("CAA"), 42 U.S.C. § 7604(a). Plaintiff alleges that Defendant Two Elk Generation Partners ("Two Elk") is attempting to build a coal-fired power plant—the Two Elk Unit 1 Power Plant ("Power Plant")—in Campbell County, Wyoming, without a proper construction permit as required under 42

U.S.C. § 7475(a); 40 C.F.R. § 52.21(a)(2)(iii); and Wyoming Air Quality Standards & Regulations ("WAQSR") Ch. 6, § 4(a)(I).  The history of Two Elk's attempt to construct the Power Plant is lengthy.

Two Elk first proposed building the Power Plant in 1996 on land in close proximity to Powder River Basin coal mines with a surfeit of non-commercial grade "waste coal." The Wyoming Department of Environmental Quality ("DEQ") issued a construction permit for Two Elk Unit 1, permit CT-1352, in February 1998.  When Two Elk had not yet begun construction two years later, the DEQ issued a revised permit, CT-1352A, requiring Two Elk to commence construction no later than February 2002.  Two Elk subsequently requested and received an extension of time to allow it to commence construction by August 2002. In September 2002, the DEQ advised Two Elk that CT-1352A was no longer valid because Two Elk still had not commenced construction.  Two Elk challenged the DEQ's finding before the Wyoming Environmental Quality Council ("Council").[1]  In May 2003, the Council approved a joint stipulation between the parties, which resulted in the issuance of a modified permit, CT-1352B.  The 2003 approved stipulation did not address whether Two Elk had actually commenced construction; it simply modified the permit to allow Two Elk until May 29, 2005 to begin construction.   The Council maintained jurisdiction over the matter in order to determine whether Two Elk complied with the revised

---

[1]  The Council is an independent review board whose function is to hear all disputes arising under the rules, regulations, and orders of the DEQ.  Wyo. Stat. Ann. § 35-11-112.

-2-

permit, CT-1352B.

By 2005, Two Elk apparently succeeded in pouring a foundation for the Power Plant's exhaust stack. The DEQ and Two Elk subsequently entered into a stipulated settlement agreement, which was approved by the Council, which confirmed that Two Elk's efforts fulfilled the "commence construction" requirement of the permit, since it required only that Two Elk complete one of four key foundations and enter into a contract to purchase a main boiler, which it also did. (*See* Def.'s Mot. to Dismiss, Attach. 3.) DEQ subsequently determined that the "commence construction" requirement of the permit had been complied with. Upon motion by Two Elk, the Council then readdressed whether its continued jurisdiction over the matter was necessary. It determined that in light of the fact that "DEQ has determined that construction has commenced, and the parties have complied with and fulfilled the terms of the Joint Stipulation, the [Council] does not need to retain jurisdiction over this matter." (*Id.* at 2.) The Council accordingly dismissed the DEQ's 2003 action and relinquished its jurisdiction over the matter.

However, on August 22, 2007, the DEQ again challenged Two Elk's permit compliance, this time because it alleged construction on the Power Plant had been discontinued for more than twenty-four months since first commenced. Two Elk filed a Petition for Review and Request for Immediate Stay with the Council contesting the DEQ's challenge. Two Elk also submitted, and the DEQ reviewed, additional confidential business information. The DEQ's review of the additional information resulted in a Joint

-3-

Stipulated Settlement Agreement and a Joint Motion for Dismissal.

The Council conducted a hearing on the matter on November 27, 2007, during the course of which, members expressed concerns regarding the fact that the project had stagnated for so long. (*See* Def.'s Mot. to Dismiss, Attach. 5.)  Not only did the length of time at issue mean that the existing permit was outmoded and did not require the implementation of newer and more effective emissions control technologies, it also meant that Two Elk had effectively "locked up" a portion of Wyoming's allowed pollution by not completing construction.  (*Id.*)  Two Elk assured the Council that it was taking steps to complete construction, including building access roads and construction wells, and relocating an oil well and pipeline on the property.  Indeed, Two Elk representative, Brad Enzi, asserted that State of Wyoming appraisers had determined that the company's work at the site between 2005 and the hearing had resulted in increasing the value of the site from $6 million to $73 million. (*Id.* at 14.)  Furthermore, DEQ represenative Dennis Finley represented that the stipulated agreement called for Two Elk to apply much newer technology recently required by DEQ-issued permits for other power plants.[2]  (*Id.* at 12.)  On December 3, 2007, the council approved the stipulated settlement agreement, and dismissed the action.

---

[2]  The Sierra Club correctly contends that this does not fulfill the CAA's BACT requirement, as Two Elk did not actually go through a proper BACT analysis tailored to the Two Elk Unit 1 facility.  Instead, it simply lifted permit requirements from a plant recently constructed by another electric utility.

At no time prior to the Council's decision did the Sierra Club intervene in the dispute between Two Elk and the DEQ.  The Sierra Club asserts it had insufficient notice of the nature of the proceedings before the Council insofar as it was not aware that the parties intended to enter into settlement discussions.  (Pl.'s Memo in Opp. at 6.)  However, the hearing resulted from a motion to stay filed with the Council by Two Elk, which stated that the Two Elk and the DEQ were in settlement talks.  *See Sierra Club v. Wyo. Dept. of Env. Quality*, No. 171-041, at 2 (First Jud. Dist. Court., Laramie County, Wyoming Mar. 13, 2009) (Order affirming Council's approval of 2007 Settlement Agreement and quoting documents publicly available on the Council's docket)).  As soon as the Council approved the settlement agreement, the Sierra Club sought to intervene by petitioning the Council for reconsideration of its December 3, 2007, order.  In orders dated March 7, 2008 and July 3, 2008, the Council determined that it lacked jurisdiction to entertain the Sierra Club's petitions.  (Pl.'s Memo in Op., Ex. 7 & 8.)

On December 20, 2007, the Sierra Club additionally sought review of the Council's actions in Laramie County District Court pursuant to the Wyoming Administrative Procedures Act, Wyo. Stat. Ann. § 16-3-101, *et seq.*  Judge Arnold issued an order dismissing the Sierra Club's appeal on March 12, 2009, after Defendant Two Elk had already moved to dismiss the instant action. On April 9, 2009, the Sierra Club submitted a notice of appeal of Judge Arnold's decision to the Wyoming Supreme Court; the Wyoming Supreme Court dismissed the appeal on June 23, 2009 on voluntary motion by

-5-

the Sierra Club.

In the interim, the Sierra Club also filed its complaint in the instant case, in which it seeks a declaration that Two Elk lacks a valid permit to construct the Power Plant.  The Sierra Club asserts two grounds for determining that Two Elk lacks a valid permit.  First, the Sierra Club asserts Two Elk  failed to commence construction prior to May 29, 2005; and second, it asserts Two Elk has failed in its obligation to conduct a "continuous program of on-site construction" of the Power Plant since 2005.

## II. Legal Issues

Now before the Court is Defendant Two Elk's Motion to Dismiss.  Defendant asserts that the Sierra Club's complaint must be dismissed because:

1)  Whether Two Elk possesses a valid construction permit and whether it has complied with the terms of that permit, has already been decided by the Council.  Two Elk asserts that this Court is prevented from hearing those cases by virtue of claim preclusion or *res judicata*.

2)  To the extent a live controversy exists in this case, it involves complicated issues of state environmental regulatory law.  Consequently, Two Elk asserts, this Court should abstain hearing this case pursuant to the *Burford* abstention doctrine, which counsels against the exercise of federal jurisdiction where it might impact on issues of primarily local or state concern, or would frustrate a state's effort to establish a cohesive policy on such a subject.  *See Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).

-6-

The Sierra Club counters that because this case arises out of the Clean Air Act's citizen suit provision, it cannot be labeled an issue of primarily state concern, thus rendering *Burford* abstention inappropriate. It further disputes Two Elk's assertion that claim preclusion prohibits this action, or that claim preclusion's close cousin, issue preclusion presents an obstacle. The Sierra Club's contentions regarding preclusion hinge on a number of issues, namely that it did not play a role in the previous action before the Council; its interests were not represented by the DEQ; and neither the claim nor the issues presented by its complaint in this action were resolved on the merits by a tribunal of competent jurisdiction. Finally, the Sierra Club asserts that the only explicit bar to a federal court's jurisdiction over a Clean Air Act citizen suit arises when the EPA or a state has commenced and is diligently prosecuting an action on the same claim. Since that is not the case here, the Sierra Club asserts that its action cannot be dismissed pursuant to Two Elk's motion.

### III.  Standard of Review

Two Elk's Motion to Dismiss comes before the Court under FED. R. CIV. P. 12(b)(1) (*Burford* abstention arguments) and 12(b)(6) (claim or issue preclusion arguments).  In considering a motion to dismiss under Rule 12, "all well-pleaded factual allegations in the amended complaint are accepted as true and viewed in the light most favorable to the nonmoving party." *Sutton v. Utah Sch. for the Deaf and Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (discussing a Rule 12(b)(6) motion).  Relief is not appropriate "unless it appears

-7-

beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (quotations and citations omitted). In considering a Rule 12(b)(1) motion to dismiss for lack of jurisdiction, a court may look beyond the face of a complaint to examine the facts on which jurisdiction is based, *E.F.W. v. St. Stephen's Indian High School*, 264 F.3d 1297, 1303 (10th Cir. 2001). In considering a Rule 12(b)(6) motion, a court may additionally consider facts subject to judicial notice, including those contained in the public record. *Tal v. Hogan*, 453 F.3d 1244, 1265 (10th Cir. 2006).

## IV. Analysis

### A. *Burford* Abstention

The principle of *Burford* abstention originated with the case of *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). In that case, the Supreme Court determined that a federal district court sitting in diversity should have refrained from exercising its otherwise valid jurisdiction in a case involving review of a Texas Railway Commission order permitting the drilling of a series of oil wells. The Supreme Court determined that federal courts should consider abstaining from cases in which federal review would risk the "independence of state governments in carrying out their domestic policies." *Id.* at 318; *see also Grimes v. Crown Life Ins. Co.*, 857 F.2d 699, 703 (10th Cir. 1988). As a general rule, however, courts strongly disfavor abstention: "The doctrine of abstention, under which a District Court may decline to exercise . . . its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Colorado River Water*

-8-

*Cons. Dist. v. United States*, 424 U.S. 800, 813 (1976) (quotations and citations omitted). Indeed, a federal court has "no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the Constitution." *Cohens v. Virginia*, 6 Wheat. 264, 404 (1821).

Abstention under the *Burford* doctrine is appropriate only where "timely and adequate state court review is available" and (1) the case presents "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case at bar," or where (2) "adjudication in a federal forum would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial concern." *New Orleans Pub. Serv., Inc. v. New Orleans*, 491 U.S. 350, 359 (1989) (*"NOPSI"*) (quotations and citations omitted). A decision to abstain from exercising jurisdiction "balances the strong federal interest in having certain classes of cases, and certain federal rights, adjudicated in federal court, against the State's interests in . . . retaining local control over difficult questions of state law." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996).

The Sierra Club's complaint is brought under the CAA's citizen suit provision, which allows that "any person may commence a civil action on his own behalf" against "any person who proposes to construct or constructs any new or modified major emitting facility without a permit." 42 U.S.C. § 7604(a)(3). The provision further provides that federal district courts shall have exclusive jurisdiction in such cases. However, this case clearly involves

-9-

elements of both state and federal law, centered as it is on a construction permit issued under Wyoming's EPA-approved State Implementation Plan.[3] Although state law and policy play an integral role in the enforcement of air quality standards in Wyoming, it is not clear that the state's role in regulating air quality makes permitting decisions a predominately state issue requiring abstention under *Burford*. Neither the Supreme Court nor the Tenth Circuit have examined the issue, and courts are otherwise split. *Compare Sugarloaf Citizens Ass'n v. Montgomery County, Md.*, 1994 WL 447442, at *3 (4th Cir. Aug. 17, 1994) (abstaining from review of elements of a PSD construction permit issued by the Maryland Department of Environment) *with Brewer v. City of Bristol*, 577 F.Supp. 519, 524 (D. Tenn. 1983) (declining to abstain under *Burford*).

Given the lack of any clear Supreme Court or Tenth Circuit precedent on the matter; the overarching federal statute from which Wyoming's permitting authority stems; and the reticence with which a federal court should consider abstention, the Court will not abstain under *Burford* from exercising its otherwise valid jurisdiction in this matter.

**B. Claim or Issue Preclusion**

Although it will not abstain under *Burford*, the Court must still consider whether the

---

[3] The requirement that major stationary sources of air pollution obtain preconstruction permits originates in the CAA's Prevention of Significant Deterioration ("PSD") program, 42 U.S.C. §§ 7475(a) and 7502(c)(5). Congress delegated to the states the "primary responsibility" for administering the CAA's requirements. 42 U.S.C. § 7407(a). Each state may establish its own State Implementation Plan ("SIP") to administer PSD permitting, so long as the program is approved by the EPA. 42 U.S.C. §§ 7410(a)(2), 7475; 40 C.F.R. § 81.351. Wyoming's SIP is EPA approved. *See* 50 C.F.R. § 52.2630.

elements of both state and federal law, centered as it is on a construction permit issued under Wyoming's EPA-approved State Implementation Plan.[3] Although state law and policy play an integral role in the enforcement of air quality standards in Wyoming, it is not clear that the state's role in regulating air quality makes permitting decisions a predominately state issue requiring abstention under *Burford*.  Neither the Supreme Court nor the Tenth Circuit have examined the issue, and courts are otherwise split.  *Compare Sugarloaf Citizens Ass'n v. Montgomery County, Md.*, 1994 WL 447442, at *3 (4th Cir. Aug. 17, 1994) (abstaining from review of elements of a PSD construction permit issued by the Maryland Department of Environment) *with Brewer v. City of Bristol*, 577 F.Supp. 519, 524 (D. Tenn. 1983) (declining to abstain under *Burford*).

Given the lack of any clear Supreme Court or Tenth Circuit precedent on the matter; the overarching federal statute from which Wyoming's permitting authority stems; and the reticence with which a federal court should consider abstention, the Court will not abstain under *Burford* from exercising its otherwise valid jurisdiction in this matter.

## B.  Claim or Issue Preclusion

Although it will not abstain under *Burford*, the Court must still consider whether the

---

[3]  The requirement that major stationary sources of air pollution obtain preconstruction permits originates in the CAA's Prevention of Significant Deterioration ("PSD") program, 42 U.S.C. §§ 7475(a) and 7502(c)(5).  Congress delegated to the states the "primary responsibility" for administering the CAA's requirements.  42 U.S.C. § 7407(a).  Each state may establish its own State Implementation Plan ("SIP") to administer PSD permitting, so long as the program is approved by the EPA.  42 U.S.C. §§ 7410(a)(2), 7475; 40 C.F.R. § 81.351. Wyoming's SIP is EPA approved.  *See* 50 C.F.R. § 52.2630.

claims and issues presented here may actually be reviewed by it, or whether the earlier actions by the Council or the Laramie County District Court preclude such review.  The permit at issue in this case was ratified by state administrative agencies in the form of a stipulated settlement agreement between Two Elk and the DEQ, which was subsequently approved by the Council and upheld on appeal by the Laramie County District Court. Defendant contends that the fact that the DEQ agreed to settle this case, and the Council approved the settlement raises issues of claim preclusion, also known as *res judicata*. Although Two Elk characterizes its defense as one of *res judicata* or claim preclusion, Sierra Club argues that if anything, the doctrine which is more appropriately applied is the closely related theory of issue preclusion or collateral estoppel.

The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are often collectively—and confusingly—referred to as "res judicata." *See Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 76 n.1 (1984); *see also Wilkes v. Wyoming Department of Employment*, 314 F.3d 501, 504 n.1 (10th Cir. 2002).[4]  Under the doctrine of claim preclusion, a final judgment forecloses "successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001).  Issue preclusion, in contrast, bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid

---

[4] As did the Court in *Migra*, this Court will refer, for the sake of clarity, to the relevant doctrines as claim and issue preclusion respectively, rather than as *res judicata* or collateral estoppel.

court determination essential to the prior judgment," even if the issue recurs in the context of a different claim. *Id.* at 748-749.  By "preclud[ing] parties from contesting matters that they have had a full and fair opportunity to litigate," these two doctrines protect against "the expense and vexation attending multiple lawsuits, conserv[e] judicial resources, and foste[r] reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. United States*, 440 U.S. 147, 153-154 (1979).

Claim preclusion exists where three elements are present: (1) a final judgment on the merits was reached in the prior suit; (2) the prior suit involved identical claims as the claims in the present suit; and (3) the prior suit involved the same parties or their privies. *Satsky v. Paramount Comm., Inc.*, 7 F.3d 1464, 1467 (10th Cir. 1993).  The prior suit need not have been concluded by the action of a court.  Final administrative agency actions may also be given preclusive effect where the agency acts "in a judicial capacity and resolves disputed issues of fact properly before it." *United States v. Utah Constr. & Mining*, 384 U.S. 394, 422 (1966); *see also Himes v. Petro Engineering & Constr.*, 61 P.3d 393, 400 (Wyo. 2003) (confirming that Wyoming courts give preclusive effect to final adjudicative decisions by administrative tribunals).  Issue preclusion requires essentially the same elements, substituting the requirement of identical issues for identical claims, but only precludes relitigation of issues actually raised in the first suit, rather than also precluding issues which could have been raised in the first action.  *See Marrese v. American Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 376 n.1 (1985)*; see also Wyoming Dept. of Rev. v. Exxon*, 162

P.2d 515, 522 (Wyo. 2007).

The Sierra Club contends here that no final judgment by a court or agency acting in a judicial-like capacity exists in this case, and that in any case, it cannot be considered to have been in privity with the Wyoming DEQ in the earlier action before the Council. Consequently, the Sierra Club asserts, no preclusive effect of either type can arise from the Council's actions in this case.[5]

The Court will address these issues in turn, and will also address whether issue or claim preclusion should apply to this case.

## 1. Identity of Parties

The Sierra Club clearly did not appear as a party in the earlier administrative actions at issue in this case, either in the dispute from 2003 to 2005 when Two Elk's compliance with the "commence construction" element of the permit was at issue, or in the 2007 dispute when the requirement that continuity of construction was at issue.  Indeed, the Sierra Club did not attempt to intervene in this matter until after the Council approved the DEQ-Two Elk 2007 settlement.  At first glance, then, neither claim nor issue preclusion should prevent the Sierra Club from prosecuting the instant action, since "[i]t is a fundamental rule of civil procedure that one who was not a party to an action is not bound by the judgment." *Pelt*

---

[5]  In its response in opposition to dismissal, the Sierra Club rests its argument regarding preclusion solely on the lack of identity of the parties and the lack of a final judgment on the merits, recognizing that "the distinction between the two doctrines [of claim and issue preclusion] is not critical for the purposes of determining whether the 2005 and 2007 orders are preclusive."  (Pl.'s Memo in Opp. at 22, n.20.)

*v. Utah*, 539 F.3d 1271, 1281 (10th Cir. 2008).

However, common identities in the original and later actions are not necessary where a later party was in privity with an original party.  *Richards v. Jefferson County, Ala.*, 517 U.S. 793, 798 (1996).  "There is no definition of 'privity' which can be automatically applied to all cases involving the doctrines of *res judicata* and collateral estoppel, since privity depends on the circumstances."  *Satsky*, 7 F.3d at 1468-69 (quotations and citations omitted).  One instance in which privity arises for the purposes of preclusion occurs in so-called *parens patriae* actions.  A *parens patriae* case involves "the right of a State to sue . . . to prevent harm to its 'quasi-sovereign' interests."  *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 258 (1972).  "*Parens patriae* standing has been explained on the ground that the plaintiff state is not merely advancing the rights of individual injured citizens, but has an additional sovereign or quasi-sovereign interest." 17 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction 2d § 4047 at 223 (1988).  Thus, "[w]hen a state litigates common public rights, the citizens of that state are represented in such litigation by the state and are bound by the judgment."  *Satsky*, 7 F.3d at 1470 (discussing so-called *parens patriae* actions, and citing *Washington v. Washington State Comm'l Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 692 n. 32 (1979)).

To be sure, environmental groups such as the Sierra Club and state or federal agencies such as the DEQ sometimes have divergent interests and priorities when it comes to enforcing environmental laws. As the Sierra Club points out in its response brief, it is

currently adverse to the DEQ in a number of state court and administrative actions. Commonality of objectives, however, is not necessarily required for *Satsky*'s privity exception to apply. The Eighth Circuit, for instance has said that regardless of divergent interests, privity may still exist "when the two parties represent the same legal right" since "privity is not dependent upon the subjective interests of the individual parties." *Harmon Indus., Inc. v. Browner*, 191 F.3d 894, 903 (8th Cir. 1999) (discussing *parens patriae* privity).[6] Although the Sierra Club and the DEQ may not agree on all matters, the DEQ can in many circumstances preclude a citizen suit by entities like the Sierra Club simply by "diligently prosecuting" an enforcement action prior to the running of § 7604's sixty day notice requirement. In such instances the DEQ would represent the same legal right as the Sierra Club, and privity would exist. During this Court's hearing on Two Elk's motion to dismiss, counsel for the Sierra Club, Elena Saxenhouse, admitted that Plaintiff did not intervene at an earlier date because it believed the DEQ would adequately prosecute the matter:

> [T]he hope was that the state would enforce this issue of the permit becoming invalid. And as far as the Sierra Club could tell, that was happening until we got word of the settlement agreement between Two Elk and DEQ in 2007,

---

[6] Interestingly, in its brief in opposition to Two Elk's motion to dismiss, the Sierra Club draws the Court's attention to another Eighth Circuit case drawing the same conclusion. *See EPA. v. City of Green Forest*, 921 F.2d 1394 (8th Cir. 1990). In that case, the Eighth Circuit determined that a consent decree entered into between the Environmental Protection Agency and a party alleged to have violated the Clean Water Act was binding under the doctrine of *res judicata* on parties who filed a citizen suit in the matter prior to the EPA's intervention. *Id.* at 1403-04.

about a week before that was approved by council.

(Tr. of Hrg. on Mot. to Dismiss at 17.)  In not so many words, Ms. Saxenhouse's comment indicates that the Sierra Club was perfectly satisfied to have the DEQ represent its interests until such time as the DEQ's decisions and actions no longer mirrored those the Sierra Club might have made.

In bringing an administrative enforcement action against Two Elk, DEQ represented the interests of Wyoming as a whole, thus placing it in privity with the citizens of Wyoming. *See Satsky*, 7 F.3d at 1470.  To that end, the DEQ made determinations, later approved by the Council, that Two Elk had both commenced and continued in the construction of the Power Plant.  Thus, the Court finds the requirement that the identity of the parties remain identical for a prior judgment to have preclusive effect is satisfied here.  The Sierra Club cannot now disturb the finality of the DEQ's decisions because is dissatisfied with the DEQ's actions, where it did not intervene at the critical moment.

## 2.  The Council's Orders Regarding the DEQ-Two Elk Settlement Agreements

The Supreme Court has stated that "[w]hen an administrative agency is acting in a judicial capacity and resolved disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose."  *Utah Constr.*, 384 U.S. at 422.  For the purposes of claim or issue preclusion, a judicially-approved settlement agreement or a consent decree can constitute a final judgment since in entering into such an agreement the parties "'desire and

-16-

expect'" its terms to be "'reflected in and enforceable as a judicial decree that is subject to the rules generally applicable to other judgments and decrees.'" *Satsky*, 7 F.3d at 1468 (quoting *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992) and discussing a consent decree issued by a Colorado federal district court). Whether or not a settlement agreement approved by the Council may constitute a final judgment deserving of preclusive effect depends upon the nature of the proceeding before the Council, as well as the content of the approved settlement itself. *See Id.* at 1468. Further, where a state agency action is involved, federal courts must apply the same preclusive effect to an agency decision that the state's courts would. *Marrese*, 471 U.S. at 380; *Crogog Co. v. Reeves*, 992 F.2d 267 (10th Cir. 1993).

Included in the materials before the Court are, among other things, the stipulated settlement agreement entered into between Two Elk and the DEQ in 2003; the 2005 Council order concluding that construction on the Two Elk facility had been commenced and relinquishing its jurisdiction; the stipulated settlement agreement entered into by Two Elk and the DEQ in 2007; a transcript of the Council's hearing on the agreement; and a copy of the Council's order approving the 2007 agreement. These documents clearly indicate the parties' intent to be bound to the terms of the 2003 and 2007 settlement agreements, thus achieving finality and repose. For instance, the 2003 agreement states that the parties "agree that each Party will be bound by this Agreement should the Council approve this Agreement and dismiss this matter." (Def.'s Mot. to Dismiss, Attach. 1 at ¶ 7.) Similarly,

Two Elk and the DEQs' joint motion for approval of the parties' joint settlement agreement states that it was filed pursuant to Wyo. Stat. Ann. § 16-3-107(n), which allows contested cases to be conclusively resolved by settlement agreement or consent decree, among other means.  The 2007 agreement states specifically that it "represents a good faith settlement of disputed factual allegations and positions of both the [DEQ] and [Two Elk]."   The Council's later order approving the 2007 settlement dismisses *with prejudice* Two Elk's appeal and "all remaining issues pending" in the action.

The Sierra Club directs the Court's attention to two portions of the settlement agreement, which it contends indicate the agreement does not preclude the instant suit. First, Plaintiff points to language in paragraph ten of the 2007 settlement agreement indicating that Two Elk would still be required to comply with all applicable WEQA regulations going forward.  Second, the Sierra Club highlights paragraph fourteen, which states in part that "the rights, duties, and obligations contained in this Agreement shall operate only among the Parties to this Agreement."

Read in its entirety, the agreement can have but one meaning.  The parties intended to resolve the issue of whether Two Elk had ceased construction for a period of twenty-four months or greater, thus invalidating the CT-1352B permit.  Explicitly restating the obvious requirement that Two Elk continued to be bound by all pertinent WEQA regulations as it continued construction does not change that conclusion.  Nor does the caveat that only the parties to the agreement would be bound by it change the analysis, since in reaching the

-18-

2007 settlement agreement the DEQ represented the interests of Wyoming, and its actions were taken on behalf of the State and its citizens.

The Council's final dismissal of the 2003 agreement contained similar language and produced a similar result, but resolved the issue of whether construction had begun by May 29, 2005. The Council's decision to relinquish jurisdiction over the 2003 settlement agreement was contingent upon Two Elk's compliance with paragraph 4(a) and (b) of CT-1352B, which required completion of a foundation for one of four key structures, as well as a contract to purchase a boiler for the site. Paragraph four of the Council's July 18, 2005 order, confirms that:

> DEQ has determined that, prior to May 29, 2005, [Two Elk] completed the construction of the foundation for the main stack, and entered into a binding written contract to purchase a site-specific main boiler, which contract is not contingent upon any additional notice to proceed or exercise of an option. [Two Elk] submitted documentation of the commencement of construction to the DEQ. [Two Elk] has, therefore, commenced construction as required by Condition 4 of Permit No. CT-1352B.

(Def.'s Mot. to Dismiss, Attach. 3 at 2.) The final sentence of the quoted text unequivocally indicates that the Council found as a matter of fact and law that Two Elk had complied with the "commence construction" portion of its permit.[7]

---

[7]  In its memorandum in opposition to Defendant's motion to dismiss, the Sierra Club appears to dispute the validity of CT-1352B in its entirety. On page 5 of its submission, the Sierra Club states that CT-1352B was invalid because it was the product of a stipulated agreement, approved by the Council without a "resolution of the factual dispute between DEQ and Two Elk as to whether Two Elk had timely commenced construction." The Sierra Club further complains that "[t]here was no public notice or opportunity for comment on the modification or settlement agreement" which produced CT-1352B. (Pl.'s Memo in Opp. at 6.)

Finally, the Sierra Club makes much of the fact that the Council never conducted

"independent factual inquiries into Two Elk's construction activities" and that the Council

allegedly did not consider the Sierra Club's claims here, that Two Elk did not conduct a

continuous program of on-site construction in order to maintain the validity of its permit. In

doing so, the Sierra Club repeats an argument made unsuccessfully before Judge Arnold

in the Laramie County District Court, in which it alleged that the Council's procedures were

deficient because it did not issue explicit findings of fact and conclusions of law. While the

Council may not have conducted a purely independent investigation in this case, it did

conduct an extensive hearing in which it reviewed the extent of Two Elk's construction

activities and the effect of those efforts on the monetary value of the project.

During her argument before the Council, Rebecca Watson, attorney for Two Elk,

spoke extensively about Two Elk's efforts at the Power Plant site, providing a two year

historical summary. She stated that:

> Beginning in June 2005 and August 2005, Belle Fourche [Pipeline Company]
> had to remove, at our expense, a pipeline and relocate it. One of our
> obligations for this is to get the site ready for construction of the power plant.

---

Plaintiff essentially claims that because it believes the revised permit itself may have been
improperly  issued, any further actions by the DEQ or the Council are invalid, and that Two Elk
is consequently constructing a major emitting facility without a permit.

    However, Sierra Club's argument to that effect appears for the first time in its opposition
to Two Elk's Motion to Dismiss, and it has not requested leave to amend its complaint in this
matter. In its single count complaint, Sierra Club contends *only* that Two Elk did not commence
construction prior to May 29, 2005, as required by CT-1352B, or, alternatively, that it
discontinued construction for a period in excess of twenty four months. (Compl. at ¶¶ 53 & 54.)

It has to be ready for people to move in and construct and obviously an [underground] pipeline in the area of the foundation is not safe so it had to be moved. The following Spring and Summer in April and July of 2006, a leaking oil well was discovered. . . . we had to get that repaired and cleaned up, because again, it resented a safety hazard to construction.

(Def.'s Mot. to Dismiss, Attach. 5 at 2.)  Ms. Watson further elucidated Two Elk's efforts to

construct an access road to the site, and explained Two Elk's financial outlays for

construction:

Beginning in May, we began work with the Wyoming Department of Transportation on building an access road to this Greenfield site from Highway 450. There was no access to the site. We had a temporary use permit from the Forest Service, but that was terminated in January of 2006. So we began the process there and then the actual physical work began this Summer on the road. There's a series of contractual and financial obligations that are represented in the box there and are described in the settlement. Some of this information is confidential business information, but the end result is that over this time period, Two Elk has paid out over $70 million to get this project going.

(Id.)  Finally, she explained the current status of the site, referring to photographic imagery:

I wanted to show you what the site looks like today and that's the second exhibit. This is the beginning of the construction of the road to Highway 450. This is the site. This is the Justice Oil Well that was recommissioned and made new again. And this is the area of the stack in the foundation. This is the site leveling work that has been done on the site. So that's the first part of the Settlement Agreement. Recognition and acceptance by DEQ of these actions is construction over the two year period.

(Id. at 3.)  Thus, the Council did in fact review the progress of construction at the site.

When it later voted unanimously to approve the 2007 Settlement Agreement, it did not do

so blindly, without any understanding of the factual circumstances on the ground at the Two

-21-

Elk site. The Sierra Club may well have desired a more stringent assessment, or a more in depth investigation. Having failed to intervene in a timely fashion, however, it cannot now disturb the Council's earlier final adjudicative decisions simply because it is dissatisfied with the outcome or the procedures employed in reaching them.

The Court can discern no difference between a settlement agreement approved by an administrative tribunal such as the Council, and one entered into by parties to a law suit in a court of law. Both are intended to be a complete resolution of the dispute at issue and both should be given preclusive effect.

### 3. Preclusive Effect of the State Court Judgment

In addition to the final decisions of the Council, the Court is also confronted with Judge Arnold's order addressing whether the Sierra Club could seek review of the DEQ and Council's actions regarding the settlement agreement, *Sierra Club v. Wyoming Department of Environmental Quality*. In that case, Judge Arnold determined that the Sierra Club could intervene and seek reversal of the Council's decision, however, he also determined that the DEQ's approval of the 2007 settlement agreement was not arbitrary and capricious and could not be overturned.

The Sierra Club now argues that because Judge Arnold (correctly) applied an arbitrary and capricious standard of review, whereas a citizen suit under 42 U.S.C. § 7604(a)(3) would receive the more lenient application of a preponderance of the evidence standard, issue preclusion cannot prevent prosecution of the instant case. *See Bulloch v.*

-22-

*Pearson*, 768 F.2d 1191, 1192-93 (10th Cir. 1985) (noting the "well-recognized exception

to the application of collateral estoppel that failure to carry a high standard of proof does not

preclude a later attempt to satisfy a lesser standard.").   Thus, the Sierra Club contends,

Judge Arnold's decision should not be given preclusive weight in and of itself.  The effect

of the Council's decision below, however, is not affected by Plaintiff's argument regarding

differing standards of review.  Indeed, the Court need not consider Judge Arnold's decision

in its preclusion analysis, any more than it would consider an appellate court's decision

upholding a trial court's ruling in similar circumstances.  Finality and repose for the purposes

of a *res judicata* analysis derive not from an appellate decision, but from the original

adjudication of an issue or claim on the merits.

### 4.  The Distinction Between Claim Preclusion and Issue Preclusion

As discussed briefly above, the parties dispute whether claim or issue preclusion is

actually at issue in this case.  The two are indeed different and often confused.  *See*

*Marrese*, 470 U.S. at 376 n.1.  Plaintiffs assert that even if they are found are in privity with

the DEQ, and the Council-approved settlement agreement constitutes a final judgment, that

claim preclusion is not at issue here.  According to Plaintiffs, "Two Elk argues that the *issue*

of whether it has a valid air permit was raised in both this action and earlier proceedings,

not that Sierra Club could have raised the same *cause of action* it has raised in federal court

in any earlier proceeding."  (Pl.'s Resp. at 22.)  The Plaintiffs go on to define their "claim"

as a CAA citizen suit that contains two issues—whether Two Elk possessed a valid permit

-23-

at all, and whether the permit was later invalidated by a failure to ensure continuous construction, which they assert they could not have brought in the earlier proceeding. (*See Id.; see also* Compl. at 15.)

Plaintiff too narrowly defines "claim" for the purposes of a preclusion analysis. The Court has not found, nor does the Sierra Club cite, any cases for the proposition that such a definition should be employed. The Restatement (Second) of Judgments, § 24 defines a claim as including "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the transaction arose." The Tenth Circuit has adopted the Restatement's "transactional" approach to defining a claim. *Mitchell v. City of Moore*, 218 F.3d 1190, 1202 (10th Cir. 2000); *see also Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1239 & n.8 (11th Cir. 1999)(employing the transactional approach and defining the principal test for determining whether a claim arises out of the same transaction as "whether the primary right and duty are the same" or whether same nucleus of operative fact is involved.); *Shadid v. Oklahoma City*, 494 F.2d 1267, 1268 (10th Cir. 1974) ("The mere assertion of a new theory based upon the Federal Constitution or statute is insufficient to entitle appellant to reconsideration in a Federal court of allegations of the same wrong, based upon the same facts, and seeking the same relief.").

However, many courts, including the Wyoming Supreme Court, have determined that the broader doctrine of claim preclusion is ordinarily inapplicable to adjudicative decisions

-24-

of administrative agencies, since such agencies typically resolve distinct issues rather than claims. *See Slavens v. Board of County Comm'rs*, 854 P.2d 683, 685 (Wyo. 1993) (citing *Salt Creek Freightways v. Wyo. Fair Emp. Pract. Comm'n*, 598 P.2d 435, 437 (Wyo. 1979)). The *Slavens* Court concluded that "although many cases speak of *res judicata* in the administrative context, they actually apply collateral estoppel." *Id.* In a more recent 2003 case citing *Slavens*, however, the Wyoming Supreme Court indicated in dicta and without significant explanation that Wyoming administrative actions may actually be given claim preclusive effect when the circumstances warrant. *Himes*, 61 P.3d at 400 (discussing the effect of a adjudicative agency decision and noting that the parallel doctrines of claim and issue preclusion can apply where "certain conditions are met"). In order to determine whether claim preclusion is at issue here, the proper analysis is not whether a suit could have been brought specifically under the CAA citizen suit provision. *See Shadid*, 494 F.2d at 1268. Instead, the Court must assess whether the operative facts involved in the instant case are the same as those involved in the DEQ's Council-approved decision that Two Elk had a valid permit.

While the doctrine of claim preclusion is ordinarily not applicable to administrative decisions, a colorable argument can be made that it should apply in this instance. The primary reasons for both claim and issue preclusion are to enhance judicial economy and increase certainty and repose among parties. In contesting Two Elk's authority to continue construction in 2007, the DEQ likely had a responsibility to assert all relevant grounds for

its contention so that the parties could be certain they had reached a position of repose

following resolution of those contentions, as is the norm in a civil action.   Grounds

unasserted by the DEQ but arising out of the same transaction might then become

unavailable to it at a later date.   While the Court finds this assessment highly plausible, it

is not presented with sufficient background regarding Wyoming's administrative procedures

and environmental regulations to draw such a conclusion.

Regardless of whether claim preclusion might arguably lie in this case, it is certain

that issue preclusion does.   The Council's decisions in 2005 and 2007 that construction on

the Two Elk Power Plant had been commenced and continuously prosecuted foreclose

further discussion of those issues in this Court.   The Sierra Club cannot independently

contend that those issues are in dispute now, after they were resolved by a settlement

agreement reached by the DEQ and Two Elk and approved in an adjudicative order issued

by the Council.   As Judge Arnold aptly concluded in his order affirming the Council's 2007

action:

> The [Council] informally disposed of a contested case by stipulation and
> agreed settlement . . . .  This was permissible, appropriate, and in fact,
> encouraged under Wyoming law.  Wyoming public policy favors settlement
> of disputes in order to avoid costly and time consuming litigation.   The
> approval of settlements also supports the public policy of finality.

See Sierra Club, No. 171-041, at 14; see also Dowlin v. Dowlin, 162 P.3d 1202 (Wyo. 2001)

(emphasizing the importance of the finality of judgments).   To allow the Sierra Club to

reopen matters already decided by the Council would run counter to the interests of judicial

economy and repose.  Consequently, the Sierra Club's case must be dismissed.

## V. Conclusion

For the foregoing reasons, the Sierra Club's complaint in this matter must be and is

dismissed.  Defendant Two Elk Generation Partners' Motion to Dismiss is GRANTED.

DATED this _____ day of August, 2009.

Chief United States District Judge

-27-